ORAL ARGUMENT NOT YET SCHEDULED

**No. 14-5196**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

GEORGE R. JARKESY, JR. AND PATRIOT28, LLC,

*Appellants*,

*v.*

SECURITIES AND EXCHANGE COMMISSION,

*Appellee*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CASE NO. 1:14-CV-00114-BAH (HON. BERYL A. HOWELL)

---

**BRIEF FOR APPELLANTS**

---

Mark B. Bierbower
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, DC 20037
Phone: (202) 955-1665
Fax: (202) 778-2201
mbbierbower@hunton.com

*Counsel for Appellants George R.
Jarkesy, Jr. and Patriot28, LLC*

Dated: December 24, 2014

S. Michael McColloch
S. MICHAEL MCCOLLOCH, PLLC
1717 McKinney Avenue, Suite 700
Dallas, TX 75202
Phone: (214) 593-6415
Fax: (214) 593-6431
smm@mccolloch-law.com

Karen L. Cook
KAREN COOK, PLLC
1717 McKinney Avenue, Suite 700
Dallas, TX 75202
Phone: (214) 593-6429
Fax: (214) 593-6431
karen@karencook.law.com

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Appellants submit the following certificate pursuant to Circuit Rule 28(a):

**A.      Parties and _Amici_.**

The following is a list of all parties, intervenors, and _amici_ who have appeared before the district court, and all parties, intervenors, or amici before the United States Court of Appeals for the District of Columbia Circuit for this Appeal:

- Appellant: George R. Jarkesy, Jr.
- Appellant: Patriot28, LLC
- Appellee: United States Securities and Exchange Commission
- Intervenors:  None at this time.
- _Amici_:  None at this time.

**B.      Rulings Under Review.**

The ruling under review is the June 10, 2014, Memorandum Opinion and Order issued by the Honorable Beryl A. Howell of the U.S. District Court for the District of Columbia in _Jarkesy, et al. v. U.S. Securities and Exchange Commission_, No. 1:14-cv-00114-BAH, Dkt. 20 and 21 (the "Action"), dismissing the Action for lack of subject matter jurisdiction and also denying the motion for preliminary and permanent injunction as moot.  The court's memorandum opinion is awaiting publication in the Federal Supplement, Second Series, but is currently

available at 2014 WL 2584403 and Fed. Sec. L. Rep. P 97, 990 (hereinafter "Mem. Op."), and in the Appendix at A278.

## C.   **Related Cases.**

The undersigned counsel are not aware of any related cases pending before any United States court of appeals or any other court, federal or local, in the District of Columbia involving substantially the same parties and the same or similar issues.

|  |  |
|---|---|
| Mark B. Bierbower | /s/ S. Michael McColloch |
| HUNTON & WILLIAMS LLP | S. Michael McColloch |
| 2200 Pennsylvania Avenue, N.W. | S. MICHAEL MCCOLLOCH, PLLC |
| Washington, DC  20037 | 1717 McKinney Avenue, Suite 700 |
| Phone:  (202) 955-1665 | Dallas, TX  75202 |
| Fax:  (202) 778-2201 | Phone:  (214) 593-6415 |
| mbierbower@hunton.com | Fax:  (214) 593-6431 |
|  | smm@mccolloch-law.com |

Karen L. Cook
KAREN COOK, PLLC
1717 McKinney Avenue, Suite 700
Dallas, TX  75202
Phone:  (214) 593-6429
Fax:  (214) 593-6431
karen@karencooklaw.com

*Counsel for Appellants George R. Jarkesy, Jr. and Patriot28, LLC*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Appellants certify that Patriot28, LLC, is a privately-held limited liability company based in Houston, Texas, that is the general partner of, and advisor to, two investment funds: the Patriot Bridge and Opportunity Fund, LP and the Patriot Bridge and Opportunity Fund, LP II.  Patriot28, LLC, certifies that it has no parent corporation and that no publicly-held company owns ten percent or more of its stock.

/s/ S. Michael McColloch
S. Michael McColloch
S. MICHAEL MCCOLLOCH, PLLC
1717 McKinney Avenue, Suite 700
Dallas, TX  75202
Phone:  (214) 593-6415
Fax:  (214) 593-6431
smm@mccolloch-law.com

Karen L. Cook
KAREN COOK, PLLC
1717 McKinney Avenue, Suite 700
Dallas, TX  75202
Phone:  (214) 593-6429
Fax:  (214) 593-6431
karen@karencooklaw.com

Mark B. Bierbower
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, DC  20037
Phone:  (202) 955-1665
Fax:  (202) 778-2201
mbierbower@hunton.com

*Counsel for Appellants George R. Jarkesy, Jr., and Patriot28, LLC*

iii

# TABLE OF CONTENTS

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES....................i

CORPORATE DISCLOSURE STATEMENT ........................................ iii

TABLE OF CONTENTS................................................................iv

TABLE OF AUTHORITIES ........................................................ vii

GLOSSARY OF TERMS ............................................................. xiii

JURISDICTIONAL STATEMENT ....................................................1

I.      Jurisdiction of the District Court ...................................................1

II.     Jurisdiction of this Court .........................................................1

STATEMENT OF THE ISSUES.......................................................2

STATUTES AND REGULATIONS....................................................3

STATEMENT OF THE CASE..........................................................4

      A.      Dodd-Frank Gives the SEC Administrative Powers to Prosecute
        Unregistered Targets for Punitive Sanctions Previously
        Reserved to Federal Court Jurisdiction .................................6

      B.      The SEC Investigates Jarkesy's Unregulated Fund and–Using
        its New Dodd-Frank Authority–Chooses to Prosecute
        Administratively...................................................................7

      C.      The Summary Administrative Proceeding ...........................9

      D.      The Commission Enters Findings of Fact and Law Regarding
        Jarkesy's Alleged Conduct Prior to Hearing.......................12

      E.      The District Court Hears and Denies Jarkesy's Application for
        Temporary Restraining Order and Later Dismisses the Entire
        Action for Lack of Subject Matter Jurisdiction...................14

STANDARD OF REVIEW ...........................................................17

SUMMARY OF THE ARGUMENT ................................................18

## TABLE OF CONTENTS
(continued)

ARGUMENT .................................................................................................22

I.   CONGRESS' DELEGATION OF POWER TO THE SEC TO
     SELECT ADMINISTRATIVE ADJUDICATION OF CLAIMS
     THAT ONLY COURTS HAD ADJUDICATED PREVIOUSLY IS A
     VIOLATION OF THE CONSTITUTIONAL SEPARATION OF
     POWERS. ............................................................................................22

     A.   The Dodd-Frank Transfer of Coextensive Administrative
          Enforcement Authority to the Commission Constitutes a
          Delegation of Legislative Power ...........................................23

     B.   Congress May Transfer its Power to Assign Certain Statutory
          Enforcement Claims for Exclusive Adjudication in an
          Administrative Forum Only Where it Imposes Specific
          Guidelines or an "Intelligible Principle" for Exercising that
          Delegated Authority .............................................................26

     C.   In Delegating Authority to the Commission to Decide Which
          Categories of Enforcement Cases Will be Adjudicated
          Administratively, Congress Failed to Provide an Exclusive
          Procedure or Any "Intelligible Principle" to Constrain the
          Commission's Decisions. ......................................................29

II.  THE DODD-FRANK STATUTORY PROVISIONS AUTHORIZING
     IMPOSITION AND COLLECTION OF ENHANCED PENALTIES
     IN ADMINISTRATIVE ENFORCEMENT PROCEEDINGS
     VIOLATE THE SEVENTH AMENDMENT ...............................................31

III. THE SEC'S ADMINISTRATIVE ENFORCEMENT
     PROCEEDINGS AGAINST JARKESY ARE VOID FOR
     PREJUDGMENT, IN VIOLATION OF JARKESY'S DUE
     PROCESS RIGHTS. .............................................................................34

IV.  JARKESY'S "SEPARATION OF POWERS / DUE PROCESS"
     AND SEVENTH AMENDMENT FACIAL CONSTITUTIONAL
     CLAIMS WERE PROPERLY BEFORE THE COURT, REQUIRING
     THEIR RESOLUTION .........................................................................46

## TABLE OF CONTENTS
(continued)

V.   JARKESY'S "AS APPLIED" EVIDENCE-BASED CLAIMS WERE
     PROPERLY BEFORE THE DISTRICT COURT, REQUIRING
     THEIR JUDICIAL RESOLUTION ............................................................48

     A.   Equal Protection Claim Requires District Court Discovery ...............48

     B.   If the Commission Prejudgment Claim is Not Resolved as a
          Matter of Law, a Remand is Required for District Court
          Discovery...............................................................................................49

     C.   Subject Matter Jurisdiction in the District Court:  The
          "Generous" Waiver of Sovereign Immunity in 5 U.S.C. § 702.........49

          (1)   Possible foreclosure of all meaningful judicial review............52

          (2)   Claims are "wholly collateral to [the] statute's review
                provisions." ...............................................................................56

          (3)   The claims are outside the agency's expertise .........................58

     D.   The district court was required to hear both of these "as
          applied" evidence-based claims ........................................................59

CONCLUSION AND PRAYER FOR RELIEF ....................................................61

CERTIFICATE OF COMPLIANCE.....................................................................64

CERTIFICATE OF SERVICE .............................................................................65

## TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                                    **<u>Page(s)</u>**

*Abbott Labs. v. Gardner,* 387 U.S. 136 (1967)....................................................51-52

*Adkins v. Rumsfeld*, 389 F. Supp.2d 579 (D. Del. 2005) ..........................................58

*Amos Treat & Co. v. SEC,* 306 F.2d 260 (D.C. Cir. 1962)...............................34, 41

\* *Antoniu v. S.E.C.*, 877 F.2d 721 (8th Cir. 1989), *cert.*
      *denied,* 494 U.S. 1004 (1990)..................................................................40-41

*Arjent LLC v. Sec. and Exch. Comm'n.,* 7 F. Supp. 3d 378
      (S.D.N.Y. 2014)........................................................................................50, 53

*Armstrong v. Manzo*, 380 U.S. 545 (1964)..............................................................30

*Ass'n of Nat'l Advertisers, Inc. v. F.T.C.*, 627 F.2d 1151
      (D.C. Cir. 1979) ................................................................. 13, 39, 45-46

*Atherton v. D.C. Office of Mayor,* 567 F.3d 672 (D.C. Cir. 2009).........................17

\* *Atlas Roofing Co. v. Occupational Safety & Health Review
      Comm'n*, 430 U.S. 442 (1977)..................................................................26, 32

*Bell Atl. v. Twombly,* 550 U.S. 544 (2007) ..............................................................17

*Bowen v. Mass.*, 487 U.S. 879 (1988).................................................................51, 59

*Chau v. Sec. & Exch. Comm'n,* Case No. 1:14-cv-1903-LAK
      (S.D.N.Y. Dec. 11, 2014) ...............................................................................59

\* *Cinderella Career & Finishing Sch., Inc. v. Fed. Trade
      Comm'n*, 425 U.S. 583 (D.C. Cir. 1970)................................................. 43-45

*Elk Run Coal Co. v. U.S. Dep't of Labor*, 804 F. Supp. 2d 8 (D.D.C. 2011) ..........47

*Elrod v. Burns*, 427 U.S. 347 (1976) ......................................................................38

*Envtl. Def. Fund v. EPA*, 485 F.2d 780 (D.C. Cir. 1973)........................................62

_____

\* Authorities upon which we chiefly rely are marked with asterisks.

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Ethyl Corp. v. EPA*, 542 F.2d 1 (D.C. Cir) (*en banc*), cert. denied,
    426 U.S. 94 (1976)........................................................................30

\* *F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502 (2009) .............................28

*Fisher–Cal Indus., Inc. v. United States*, 747 F.3d 899 (D.C. Cir. 2014) ...............17

\* *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010)................................................... 15, 27, 49-50, 52, 56, 58

\* *Gen. Elec. v. E.P.A.*, 360 F.3d 188 (D.C. Cir. 2004)...........................................47

*Granfinanciera, S.A., v. Nordberg*, 109 S. Ct. 2782 (1989)...................................26

*Greater Baltimore Center for Pregnancy Concerns, Inc., v. Mayor and
    City Council of Baltimore*, 721 F.3d 264 (4th Cir. 2013) ............................54

*Gupta v. Sec. and Exch. Comm'n,* 796 F. Supp. 2d 503
    (S.D.N.Y. 2011)..................................................................................50, 53, 56

\* *I.N.S. v. Chadha*, 462 U.S. 919 (1983) ........................................................24, 30

*In re Murchison,* 349 U.S. 133 (1955)...............................................................34, 41

*J.W. Hampton, Jr., & Co. v. United States,* 276 U.S. 394 (1928) ....................26, 28

*Jacksonville Port Auth. v. Adams*, 556 F.2d 52 (D.C. Cir. 1977)...........................38

*Jarkesy v. S.E.C.,* No. 14-114, ---F. Supp. 2d----, 2014 WL 2584403
    (D.D.C. June 10, 2014)................................................................................15

*Johnson v. Robison,* 415 U.S. 361 (1974) ...............................................................47

*Kalaris v. Donovan*, 697 F.2d 376 (D.C. Cir. 1983) ..............................................23

*Live365, Inc. v. Copyright Royalty Bd.*, 698 F. Supp. 2d 25 (D.D.C. 2010)...........47

*Loving v. United States,* 517 U.S. 748 (1996) ...................................................23, 27

*Marbury v. Madison*, 5 U.S. 137 (1 Cranch) (1803) ..............................................60

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ............................................................30

*McNary v. Haitian Refugee Ctr., Inc.,* 498 U.S. 479 (1991) .....................................47

*Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.,* 501 U.S. 252 (1991) .............................................................24

*Miller v. Caldera*, 138 F. Supp. 2d 10 (D.C. Cir. 2001) .....................................53-54

*Mills v. Dist. of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009) ....................................38

* *Mistretta v. United States,* 488 U.S. 361 (1989)...................................................28

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982)...............32

*Nat'l Envtl. Dev. Ass'n's Clean Air Project v. E.P.A.*, 752 F.3d 999 (D.C. Cir. 2014) .....................................................................22-23

*Nix v. Billington*, 448 F.3d 411 (D.C. Cir. 2006).....................................................17

*NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937) .....................................32

*Offutt v. United States,* 348 U.S. 11 (1954) ............................................................41

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296 (D.C. Cir. 2014) ..............................................................................17

*SEC v. Citigroup Global Mkts. Inc.*, No. 1:11-CV-07387, --- F. Supp. 2d ----, 2014 WL 3827497, at *3 n.8 (S.D.N.Y. Aug. 5, 2014) ..................................4

* *Texaco, Inc. v. Fed. Trade Comm'n*, 336 F.2d 754 (D.C. Cir. 1964), *vacated on other grounds,* 381 U.S. 739 (1965) ...........................................42

*Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568 (1985).................24, 29

* *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)..................... 15, 49-50, 52

*Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178 (D.C. Cir. 2006) ...........................51

* *Tull v. United States*, 481 U.S. 412 (1987)..................................................... 32-33

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Mazurie*, 419 U.S. 544 (1975) .......................................................27

*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) ...........................................54

\* *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) .......................... 23, 26-27

*Whitney Nat'l Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.,*
      379 U.S. 411 (1965) ........................................................................................27

*Yakus v. United States*, 321 U.S. 414 (1944) .........................................................30

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ............................30

### Regulatory Decisions

*In the Matter of Adrian Antoniu,* 48 S.E.C. 909, Admin. Proc. File
      No. 3-6566 (1987) .........................................................................................40

### Statutes & Regulations

5 U.S.C.

      § 551 *et seq.* ...................................................................................................9

      § 554(d)(2) ......................................................................................................49

      § 554(e) ...........................................................................................................37

      § 557 ..........................................................................................................12, 49

\*      § 702 ............................................................................................48-49, 51, 59

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

15 U.S.C.

§ 77a, *et seq.* ...................................................................................6

§ 77b, *et seq.* ...................................................................................6

§ 77h-1(g)(2) ....................................................................................7

§ 77t(d)(2) .......................................................................................7

§ 78u-3 ...........................................................................................52

§ 78y(a)(1) ......................................................................................52

§ 80a-1, *et seq.* .................................................................................6

§ 80b-1, *et seq.* .................................................................................6

28 U.S.C § 1651 ..........................................................................22, 62

Securities Enforcement Remedies and Penny Stock Reform Act of 1990,
      Pub. L. No. 101-429 (1990).............................................................25

* Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010,
      Pub. L. No. 111-203 (2010)...........................................................4, 25

H. REP. NO. 111-687, at 78 (2009)...........................................................7

17 C.F.R.

§ 201.121 ........................................................................................12

§ 201.230(a) ....................................................................................10

§ 201.240 ........................................................................................44

§ 201.360(a)(2) .................................................................................10

§§ 201.400-490 .................................................................................12

§ 201.411 ........................................................................................12

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Fed. R. App. P. 38 .......................................................................................55


### Other Authorities

Articles & Periodicals

Bryan Mahoney, *SEC Could Bring More Insider Trading Cases In-
      House*, Law360, June 11, 2014, available at
      http://www.law360.com/articles/547183/sec-could-bring-more-
      insider-trading-cases-in-house ......................................................11

Jean Eaglesham, *SEC Is Steering More Trials to Judges It Appoints*,
      Wall Street Journal Online Edition, Oct. 21, 2014, available at
      http://www.wsj.com/articles/sec-is-steering-more-trials-to-
      judges-it-appoints-1413849590 ......................................................11

R. Stewart & C. Sunstein, *Public Programs and Private Rights*, 95
      HARV. L. REV. 1193, 1248 (1982) .................................................28

Sarah N. Lynch, *U.S. SEC to file some insider-trading cases in its in-
      house court*, Reuters Online Edition U.S., June 11, 2014,
      available at http://www.reuters.com/article/2014/06/11/sec-
      insidertrading-idUSL2N0OS1AT20140611...................................12

U.S. Sec. & Exch. Comm'n, *SEC Announces New Hires in the
      Office of Administrative Law Judges*, SEC Press Release
      2014-129, June 30, 2014 available at
      http://www.sec.gov/News/PressRelease/Detail/PressRelea
      se/1370542202073#.VJeM_V4Aw .............................................10

# GLOSSARY OF TERMS

| | |
|---|---|
| Advisers Act | Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-1, *et seq.* |
| Agency | United States Securities and Exchange Commission |
| ALJ | Administrative Law Judge |
| APA | Administrative Procedure Act |
| Dodd-Frank | Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376 (2010) |
| Enforcement Division Or Division | Division of Enforcement of the United States Securities and Exchange Commission |
| Exchange Act | Securities Exchange Act of 1934, 15 U.S.C. §§ 78a, *et seq.* |
| Jarkesy | George R. Jarkesy, Jr. and Patriot28, LLC |
| Order Instituting Proceedings | Order Instituting Public Administrative and Cease-and-Desist Proceedings |
| SEC | United States Securities and Exchange Commission |
| Securities Act | Securities Act of 1933, 15 U.S.C. §§ 77a, *et seq.* |

## JURISDICTIONAL STATEMENT

### I.     Jurisdiction of the District Court

Appellants brought an action for injunctive and declaratory relief against the Securities and Exchange Commission alleging multiple constitutional violations—facial and as-applied—in connection with an administrative enforcement proceeding initiated by the agency against them.  The court had subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1337, 1346, 1651 and 2201, and pursuant to 5 U.S.C. §§ 702, 703 and 706.

### II.     Jurisdiction of this Court

This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.   CONGRESS' DELEGATION OF LEGISLATIVE POWER TO THE SEC
     TO DECIDE BETWEEN EITHER ADMINISTRATIVE OR JUDICIAL
     ADJUDICATION OF ENFORCEMENT ACTIONS IS A VIOLATION OF
     THE CONSTITUTIONAL SEPARATION OF POWERS.

II.  THE DODD-FRANK STATUTORY PROVISIONS AUTHORIZING
     IMPOSITION AND COLLECTION OF ENHANCED PENALTIES IN
     ADMINISTRATIVE ENFORCEMENT PROCEEDINGS VIOLATE THE
     SEVENTH AMENDMENT

III. THE SEC'S ADMINISTRATIVE ENFORCEMENT PROCEEDINGS
     AGAINST JARKESY ARE VOID FOR PREJUDGMENT, IN
     VIOLATION OF JARKESY'S DUE PROCESS RIGHTS

IV.  JARKESY'S "SEPARATION OF POWERS / DUE PROCESS" AND
     SEVENTH AMENDMENT FACIAL CONSTITUTIONAL CLAIMS
     WERE PROPERLY BEFORE THE COURT, REQUIRING THEIR
     JUDICIAL RESOLUTION

V.   JARKESY'S "AS APPLIED" EVIDENCE-BASED CLAIMS WERE
     PROPERLY BEFORE THE DISTRICT COURT, REQUIRING THEIR
     JUDICIAL RESOLUTION

2

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the Statutory and Regulatory Addendum.

## STATEMENT OF THE CASE

In this case of first impression, a private investment fund and its manager challenge—on constitutional grounds—the expanded administrative enforcement authority given to the United States Securities and Exchange Commission ("SEC") by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank") to seek and impose severe penalties for alleged infractions of securities laws. In exercising this new authority, claims for punitive sanctions that previously could only be brought in a district court, where defendants are afforded their right to a jury determination and numerous other constitutional and procedural safeguards, may, at the discretion of the SEC, be pursued administratively without those safeguards in a forum where the SEC operates as prosecutor, judge and appellate court—and where the SEC now prevails 100% of the time. In considering the breadth of the SEC's enhanced powers in the administrative trial setting, one federal district court judge has recently asked: "One might wonder: from where does the constitutional warrant for such unchecked and unbalanced administrative power derive?"[1]

This case involves an action brought to enjoin an SEC administrative enforcement proceeding against George R. Jarkesy, Jr., a Houston-based entrepreneur, and Patriot28, LLC, the adviser to and general partner of a private

---

[1]    *SEC v. Citigroup Global Mkts. Inc.*, No. 1:11-CV-07387, --- F. Supp. 2d ----, 2014 WL 3827497, at *3 n.8 (S.D.N.Y. Aug. 5, 2014).

investment fund (hereinafter, collectively, "Jarkesy"), in which the SEC has charged Jarkesy with securities law violations. Because of the limited size of the investor group, Jarkesy was not required to register with the SEC as an investment adviser or investment fund and, at the time—pre-Dodd-Frank—was not subject to the panoply of penalties otherwise available to the SEC through administrative adjudication.

Through its administrative proceeding challenged here, the SEC's Enforcement Division has sought the imposition of *lifetime* securities-industry and officer-and-director bars and over *$100 million* in punitive "civil" monetary penalties for violations allegedly committed by Jarkesy, including conduct prior to enactment of the Dodd-Frank amendments. As the proceeding was pending, but prior to the evidentiary hearing before the SEC's administrative law judge ("ALJ")—where the Division's allegations would be tried—the Commission convened and issued a published order finding that Jarkesy had committed securities law violations as alleged. This Action was brought in advance of that administrative hearing to enjoin further proceedings and for a declaratory judgment that the proceedings were being conducted in violation of Jarkesy's Fifth Amendment due process rights, Fifth Amendment equal protection rights, Seventh Amendment right to trial by jury, and the constitutional separation of powers.

The district court conducted a hearing on Jarkesy's application for temporary restraining order on January 31, 2014—three days before the scheduled commencement of the evidentiary hearing before the SEC's ALJ. The court denied the TRO and later filed a written order and memorandum opinion dismissing Jarkesy's claims for lack of subject matter jurisdiction. (A279, A291)

## A.  Dodd-Frank Gives the SEC Administrative Powers to Prosecute Unregistered Targets for Punitive Sanctions Previously Reserved to Federal Court Jurisdiction

Dodd-Frank was enacted in the wake of the "Great Recession" and resultant financial market turmoil. It authorized the SEC to administratively prosecute any civil securities fraud claim it chose to bring and seek punitive sanctions against ordinary, unregulated citizens and entities which were not required to register with any federal or state securities regulator. Dodd-Frank fundamentally changed SEC enforcement under the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77a, *et seq.*, the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78a, *et seq.*, the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-1, *et seq.*, and the Investment Company Act of 1940, 15 U.S.C. §§ 80a-1, *et seq.* Prior to Dodd-Frank, unregistered individuals in administrative enforcement proceedings were subject only to non-punitive sanctions, like a cease-and-desist order. Dodd-Frank amended those statutes to authorize, in addition to equitable relief, separate and enormous civil penalties, and now allows the imposition of

6

monetary "per violation" penalties that are identical to, *or greater than*, the statutory provision governing judicially-imposed civil penalties for identical federal securities law violations.  Under the Securities Act, for example, maximum per-violation administrative penalties are 50 percent greater than what Article III courts may impose per violation.[2]

As a result of these amendments, there is no material difference between administrative enforcement and judicial enforcement of the securities laws.  The sparse legislative history of this provision of Dodd-Frank confirms a congressional intent to "mak[e] the SEC's authority in administrative penalty proceedings coextensive with its authority to seek penalties in Federal court."[3]  Nowhere in the statutory language or in the legislative history is there any suggestion that Congress considered constitutional impediments to this unprecedented transfer of power to an executive enforcement agency.

**B.    The SEC Investigates Jarkesy's Unregulated Fund and—Using its New Dodd-Frank Authority—Chooses to Prosecute Administratively**

In 2007, Mr. Jarkesy formed a limited partnership to pursue the financing of

---

[2]    *Compare* 15 U.S.C. § 77h-1(g)(2) (maximum monetary "civil" penalties available in an administrative proceeding under the Securities Act) with 15 U.S.C. § 77t(d)(2) (maximum monetary "civil" penalties available in a federal district court action under the Securities Act).

[3]    *See* H. REP. NO. 111-687, at 78 (2009) (House Report by Rep. Barney Frank, Chairman, Committee on Financial Services, discussing "The Investor Protection Act of 2009," H.R. Res. 3817, later incorporated in Dodd-Frank).

troubled entities and investing in high-risk financial instruments. (A010) Jarkesy formed appellant Patriot 28, LLC, (originally named JTCM, LLC) to be the advisor and general partner. (A093)   Due to the limited size of the investor group (approximately 120), neither Patriot28,LLC, as advisor nor Mr. Jarkesy as the manager was required to register with the SEC or any state securities regulator. (A093)  The resulting investment funds were to be offered exclusively to high-net-worth individuals who knowingly accepted the funds' very-high-risk investment strategy and acknowledged their ability to bear the loss of their entire investment. (A046) Mr. Jarkesy was one of the largest investors, contributing approximately $600,000 of his own money in the funds.  (A046)  The funds invested in small- and mid-cap corporate equities and life settlements (i.e., assignments of high-benefit life insurance policies), and made bridge loans to development stage, or "start-up," companies.  (A046)

The project was ill-timed; the 2008-2009 financial crash battered the markets and caused countless start-ups to fail.  The fund's heavy concentration in fledgling energy-sector companies proved devastating to the portfolio, and the fund attracted the attention of the SEC's Division of Enforcement ("Enforcement Division"), which spent several years investigating Jarkesy and the New York-based registered brokerage firm that served as placement agent to market and sell investments in the funds to qualified investors.  (A046, A091)

At the conclusion of the investigation, instead of authorizing an enforcement action in federal court, the Commission issued an "Order Instituting Public Administrative and Cease-And-Desist Proceedings" ("Order Instituting Proceedings") in March, 2013, initiating an administrative proceeding against Jarkesy, and also against the broker-dealer and its principal. (A091)  In the Order Instituting Proceedings, the Commission recounted the Division of Enforcement allegations that Jarkesy and the broker-dealer had violated the Securities Act, Exchange Act and Advisers Act. (A091)  The Order Instituting Proceedings did not allege that Jarkesy misappropriated any client funds, but it nevertheless sought the disgorgement of management fees, lifetime securities-industry and officer-and-director bars, money penalties, and a cease-and-desist order.  (A091)

## C.     The Summary Administrative Proceeding

Like many federal regulatory agencies, the SEC is authorized to conduct administrative proceedings in accordance with the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA").  For targets of the administrative process, the SEC "Rules of Practice," 17 C.F.R. 201, subpart D, provide for summary proceedings that are initiated by an Order Instituting Proceedings, alleging facts that the Commission has "reason to believe" constitute one or more violations of securities laws.  (A101)  From that point forward, the Enforcement Division staff serves as

trial counsel prosecuting the claims, and several ALJs act as presiding quasi-judicial officers at the administrative hearings and in any pre-hearing conferences. [4]

The SEC Rules of Practice provide that the ALJ must file a written "Initial Decision" with the Commission in no more than 300 days after initiation of the case.  *See* 17 C.F.R. 201.360(a)(2). These tight time limits restrict respondents' time for pre-trial preparation to approximately four months.  *Id.*

For respondents relegated to defending charges in SEC administrative proceedings, no actual "discovery" is available under the Rules of Practice.  The Enforcement Division is required to produce to respondents the "investigat[ive]" file resulting from its years of subpoenaed document-gathering and investigative testimony transcripts, but there is no rule or protocol for its production of documents and data in any organized, usable format.  *See* 17 C.F.R. 201.230(a).  In Jarkesy's case, the Enforcement Division served up a hard drive with 700 gigabytes ("Gb") of data, which is roughly equivalent to 7,000 linear yards of books on shelves, or between 15 and 25 million pages of unorganized, un-indexed

---

[4]  The SEC has recently hired two new ALJ's to accommodate its increased resort to enforcement litigation through the administrative process.  *See* U.S. Sec. & Exch. Comm'n*, SEC Announces New Hires in the Office of Administrative Law Judges*, SEC Press Release 2014-129, June 30, 2014, available at http://www.sec.gov/News/PressRelease/Detail/PressRelease/1370542202073#.VJeM_V4Aw.

and often mislabeled documents.[5]  (A108)  All of Jarkesy's pre-hearing motions were denied, including his request for a continuance to allow time to attempt to review the millions of electronic documents produced by the Enforcement Division.  (A111, A122)

These summary "discovery–by–trial" procedures and the expansion of the SEC's administrative enforcement powers have resulted in the agency prevailing in these administrative enforcement actions nearly 100% of the time over the preceding three years, currently boasting a remarkable win rate of exactly 100% [6] By comparison, the agency prevails around 61% of the same types of cases tried before juries in Article III courts.[7]  Not surprisingly, the Enforcement Division effectively uses the mere threat of administrative enforcement to coerce settlements.[8]  As a result, the SEC directs an increasing number of cases, regardless

---

[5]  A prominent IT expert estimated that it would take two lawyers working 12-hour days some *47 years* to review this enormous database to cull out the relevant and exculpatory documents. *See* A108.

[6]  A048-049.  A recent study by *The Wall Street Journal* revealed that the agency won 100% of its administrative proceedings in the last fiscal year.  *See* Jean Eaglesham, *SEC Is Steering More Trials to Judges It Appoints*, THE WALL STREET JOURNAL, Oct. 21, 2014, available at http://www.wsj.com/articles/sec-is-steering-more-trials-to-judges-it-appoints-1413849590.

[7]  *Id*.

[8]  The Director of Enforcement recently stated, "I will tell you that, there have been a number of cases in recent months where we have threatened administrative proceedings, it was something we told the other side we were going to do, and they settled." Bryan Mahoney, *SEC Could Bring More Insider Trading Cases In-House*,

of their complexity, to administrative proceedings instead of federal court, including insider-trading cases.[9]

## D.    The Commission Enters Findings of Fact and Law Regarding Jarkesy's Alleged Conduct Prior to Hearing

Under the APA and the Commission's own Rules of Practice, after voting to file an Order Instituting Proceedings, the Commission role is that of appellate tribunal that may exercise discretionary jurisdiction over pre-hearing disputes. *See* 17 C.F.R. § 201.121; *see generally* 17 C.F.R. § 201.400-490.  Once the evidentiary hearing is completed and the ALJ enters an "Initial Decision"—recommended findings, conclusions and sanctions—either or both parties may appeal those recommendations to the Commission, which reviews the recommendations *de novo. See* 5 U.S.C. § 557(b); 17 C.F.R. § 201.411.

The Commission's "Final Decision" establishes culpability and sanctions. The APA and this circuit's jurisprudence require the commissioners to remain "neutral and detached adjudicator[s]" throughout the proceedings, meaning up

---

Law360, June 11, 2014, available at http://www.law360.com/articles/547183/sec-could-bring-more-insider-trading-cases-in-house.

[9]  *See* Sarah N. Lynch, U.S. SEC to File Some Insider-Trading Cases in its In-House Court, REUTERS, June 11, 2014, available at http://www.reuters.com/article/2014/06/11/sec-insidertrading-idUSL2N0OS1AT20140611.

through this issuance of the Commission's "Final Decision.[10]

On December 4, 2013, two months prior to the administrative hearing on the merits before the SEC's ALJ, something extraordinary happened. The Commission convened to consider a settlement with Jarkesy's two co-respondents at the recommendation of the Enforcement Division.  In this settlement proposal, the two settling co-respondents *expressly declined to admit any of the SEC's factual allegations* or to their alleged culpability, and only agreed to the SEC's jurisdiction over them and to the negotiated sanctions. (A124)  The commissioners approved the settlement and, on December 5, 2014, published the order on the SEC website. In that order, however, the commissioners included their own detailed factual findings that *Jarkesy* had in fact committed some eighty-six of the acts alleged in the Order Instituting Proceedings and that Jarkesy had thereby violated the Advisers Act, also as alleged in the Order Instituting Proceedings. (A124-A131) Jarkesy's subsequent motions for recusal and dismissal for the Commission's prejudgment of the case were denied by the ALJ and then denied by the Commission on interlocutory appeal.[11]

---

[10]    *See, e.g., Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1168 (D.C. Cir. 1979).

[11]   Order Denying Petition for Interlocutory Review, January 28, 2014, available at http://www.sec.gov/litigation/opinions/2014/33-9519.pdf.

**E.     The District Court Hears and Denies Jarkesy's Application for Temporary Restraining Order and Later Dismisses the Entire Action for Lack of Subject Matter Jurisdiction**

Jarkesy filed the Action in the court below on January 29, 2014, the day after the Commission denied his petition for interlocutory review over its prejudgement of the administrative case against him. (A008) *See* n.11, *supra*.   For the purposes of the issues in this appeal, in the complaint Jarkesy sued for injunctive and declaratory relief, and asserted constitutional claims:

(1)    That the Commission's prejudgment of the merits violated Jarkesy's Fifth Amendment due process rights;

(2)    That the powers delegated by Congress to the Commission to initiate administrative proceedings seeking to impose severe penalties violated both the Seventh Amendment and the separation of powers;

(3)    That the Commission's decision to prosecute Jarkesy administratively was arbitrary and capricious and thereby violated Jarkesy's Fifth Amendment right to equal protection under  the law.

The district court conducted a hearing on the TRO application on January 31, 2014.   During the hearing the SEC agreed that Congress had provided no standards governing the Commission's selection of an administrative forum to seek penalties and sanctions instead of proceeding with a traditional enforcement action

14

in federal court. (A236-37) At its conclusion, the court declined to issue a TRO on the grounds that the court lacked subject matter jurisdiction to entertain any of Jarkesy's claims. (A243) The court applied its ruling—specifically in the context of the *Free Enterprise*/*Thunder Basin*[12] formulation for divining congressional intent—to "every argument raised by the plaintiffs" in their complaint. (A245)

The administrative "trial" began the next business day, February 3, 2014, in New York City and continued intermittently until March 14, 2014. (A140, A252) The district court awaited the anticipated conclusion of the SEC hearing and entered a show cause order asking why the case should then not be dismissed as moot. (A004) Jarkesy's filed response explained again that the evidentiary hearing before the ALJ was just one step in an extended administrative process and that, in any event, the court's oral pronouncement from the bench—that subject matter jurisdiction was found wanting—mandated the entry of a written, appealable order. (A252-266) Months later, as Jarkesy awaited the ALJ's preparation and issuance of the "Initial Decision," the district court entered the written dismissal order and memorandum opinion. *Jarkesy v. S.E.C.,* No. 14-114(BAH), ---F. Supp. 3d----, 2014 WL 2584403 (D.D.C. June 10, 2014). (A278-290)

Jarkesy filed notice of appeal (Dkt. 1507239) and a motion for expedited consideration. (Dkt. 1511913) The SEC filed a motion for summary affirmance.

---

[12] *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 489-92 (2010); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994).

(Dkt. 1514130)  This Court denied the SEC's motion for summary affirmance on November 18, 2014, and ordered a briefing schedule and oral argument to be conducted this term.  (Dkt. 1522976)  Following this Court's order setting the submission schedule for this term, the Commission—apparently for the first time in decades—entered an extraordinary order accelerating its own review of the evidence to expedite the conclusion of the administrative proceeding against Jarkesy.[13]

---

[13]  *See In the Matter of John Thomas Capital Management Group LLC*, Admin. Proc. File No. 3-15255, Order Granting Review and Scheduling Briefs, p. 2, December 11, 2014, available at http://www.sec.gov/litigation/opinions/2014/33-9688.pdf.  A thorough electronic Boolean search through the Commission's decisional database back to the 1980's—for any order containing any form of the word "expedite"—returned one Commission order on petition for review of initial decision:  the December 11, 2014, order granting the Division's motion to expedite in Jarkesy's case.

## STANDARD OF REVIEW

"We review *de novo* the district court's dismissal for lack of subject matter jurisdiction." *Fisher–Cal Indus., Inc. v. United States*, 747 F.3d 899, 902 (D.C. Cir. 2014); *Nix v. Billington*, 448 F.3d 411, 414 (D.C. Cir. 2006).   In reviewing a district court's dismissal, "so long as the pleadings suggest a 'plausible' scenario to 'show that the pleader is entitled to relief,' a court may not dismiss." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 314-15 (D.C. Cir. 2014); *Atherton v. D.C. Office of Mayor,* 567 F.3d 672, 681 (D.C. Cir. 2009) (quoting *Bell Atl. v. Twombly,* 127 S. Ct. 1955 (2007)).

## SUMMARY OF ARGUMENT

I.     Congress may only delegate its legislative power to an executive agency when it creates "exclusive" procedures "designed to permit agency expertise to be brought to bear on particular problems," and statutorily imposes "an intelligible principle to which the person or body authorized to [act] is directed to conform." The assignment of administrative adjudicatory authority to executive agencies constitutes the delegation of legislative power, because the decisions surrounding agency adjudications "alter the legal rights, duties, and relations of persons ... outside the legislative branch," and involve "determinations of policy," The authority to force a citizen to defend a civil enforcement action in administrative proceedings instead of federal courts includes the power to divest that citizen of Seventh Amendment rights and other constitutional and procedural protections. But in vesting the Commission with jurisdiction to adjudicate internally securities fraud cases fully "coextensive" with Article III courts in Dodd-Frank, Congress failed to impose any policy, boundaries or "intelligible principle" to guide the Commission's decision on choice of forum, thus precluding any kind of judicial review.   Congress has thereby purported to confer upon the Commission the unbridled and unreviewable discretion to unilaterally strip a citizen of these vital rights, in violation of the separation of powers and the due process clause of the Fifth Amendment.

18

**II.**    In giving the SEC unprecedented power to assess the civil penalties that are punitive in nature and are imposed under a separate statutory provision focused exclusively on adjudicating liability for penalties—in contrast to a statutory provision, such as the one before the Supreme Court in *Atlas Roofing v. OSHA*, where penalties are intertwined with remedial measures—Dodd-Frank transformed the SEC administrative enforcement program for ordinary, unregistered persons like Jarkesy into a penalty-collection program that is indistinguishable from the Water Act penalty program before the Supreme Court in *Tull v. United States*. Because the Dodd-Frank administrative penalty provisions are functionally identical to the Clean Water Act provision in *Tull*, they violate the Seventh Amendment and render the pending administrative action against Jarkesy unlawful.

**III**.    "A fair trial in a fair tribunal" is the basic requirement of due process, the "principles of [which] apply to administrative adjudications."   Two months before Jarkesy's evidentiary hearing and without any hearing whatsoever, the commissioners entered a highly unusual order finding him guilty as alleged.   The order was entered in connection with a settlement with Jarkesy's co-respondents, who expressly declined to admit to any facts, and thus the findings against Jarkesy were were those of the commissioners.   This *ex parte* adjudication of Jarkesy's guilt, two months *before* the hearing on the merits, was enough to support all of the

19

disgorgement and penalties sought by the Enforcement Division in the Order Instituting Proceedings. It made a mockery of the administrative adjudicatory process, and under this circuit's precedents rendered the agency's enforcement proceeding void.

IV.      Although the district court agreed that subject matter jurisdiction would lie for a "facial" constitutional claim regardless of possible exhaustion requirements, the court misconstrued Jarkesy's separation of powers and Seventh Amendment claims as "as applied" challenges. Those claims challenge the constitutional validity of the underlying enabling statutory scheme, not simply their application to Jarkesy. The court therefore erred in dismissing these claims for want of subject matter jurisdiction.

V.      The district court ignored the "generous" waiver of sovereign immunity in 5 U.S.C. § 702 and misconstrued the three-pronged *Free Enterprise*/*Thunder Basin* guideline in concluding that the court had no subject matter jurisdiction to hear Jarkesy's "as applied" constitutional claims for equitable relief. Successful pursuit of these claims—equal protection and due process/prejudgment—requires the development of evidence from formal discovery and litigation procedures that are not available in the agency administrative or review process, and the inability to adduce such evidence could foreclose all meaningful judicial review of these claims. The claims are "wholly collateral" to the APA's review provisions because

20

they are independent of and irrelevant to the securities fraud allegations against Jarkesy.  The resolution of complex constitutional claims is not within the agency's expertise.  If the district court's reading of *Free Enterprise*/*Thunder Basin* were correct, administrative proceeding respondents would have no effective recourse for the most egregious of "as applied" constitutional deprivations.

## **ARGUMENT**

I.  **CONGRESS' DELEGATION OF POWER TO THE SEC TO SELECT ADMINISTRATIVE ADJUDICATION OF CLAIMS THAT ONLY COURTS HAD ADJUDICATED PREVIOUSLY IS A VIOLATION OF THE CONSTITUTIONAL SEPARATION OF POWERS.**

In the court below—and in the underlying SEC administrative proceeding—Jarkesy challenged the Commission's decision to cast him into its internal courts as an exercise of legislative power that it could not constitutionally arrogate because the underlying statutory scheme trampled the doctrine of separation of powers. (A009, A078)  The district court apparently[14] mistook this as an "as applied" constitutional challenge on the way to disposing of the Action on jurisdictional grounds.[15]

Despite the lower court's mistaken disposition, this Court is empowered to go beyond the order under review to reach and decide the question presented under the plenary power vested by 28 U.S.C. § 1651(a) and because the claim presents a purely legal issue that will not benefit from further factual development. *See Nat'l*

---

[14]   The court below never addressed the separation-of-power challenge directly, and neither did the SEC.  Indeed, the SEC has avoided discussion of this issue in all of its pre- and post-hearing briefing in the district court and in the motions panel briefing in this Court.

[15]   In its memorandum opinion, the district court conceded that subject matter jurisdiction *would* necessarily lie for any "facial" constitutional challenge, but asserted—mistakenly—that a facial challenge was "not present in this case." Mem. Op. at 11.  That the statutory "exhaustion of remedies" requirements do not apply to facial constitutional challenges will be addressed *infra*, at 48-59.

*Envtl. Dev. Ass'n's Clean Air Project v. E.P.A.*, 752 F.3d 999, 1003 (D.C. Cir. 2014) (petitioner's claim is ripe for review because it presents a purely legal issue that will not benefit from further factual development).

## A.     The Dodd-Frank Transfer of Coextensive Administrative Enforcement Authority to the Commission Constitutes a Delegation of Legislative Power.

Article I, § 1, of the Constitution vests "[a]ll legislative Powers herein granted … in a Congress of the United States." *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 472 (2001) (quoting *Loving v. United States,* 517 U.S. 748, 771 (1996).)   As discussed below, the courts have cautiously permitted certain delegations of legislative power to the executive branch, but only under limited circumstances.  The Supreme Court has explained that "[l]egislative action which is delegated to executive agencies becomes executive action by virtue of the delegating legislation, which is subject to judicial review." *I.N.S. v. Chadha*, 462 U.S. 919 (1983).  "A court is empowered to examine Congress' jurisdictional grants and to determine whether such grants are valid." *Kalaris v. Donovan*, 697 F.2d 376, 398 n.89 (D.C. Cir. 1983).  "In a delegation challenge, the constitutional question is whether the statute has delegated legislative power to the agency." *Whitman*, 531 U.S. at 472.

Congressional assignment of administrative rule-making and adjudicatory authority to executive agencies constitutes the delegation of legislative power.

Government actions that "have 'the purpose and effect of altering the legal rights, duties, and relations of persons ... outside the Legislative Branch,'" constitute legislative action. *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.,* 501 U.S. 252, 276 (1991). The decision-making surrounding agency adjudications "alter [ ] the legal rights, duties, and relations of persons ... outside the legislative branch," and involve "determinations of policy." *Chadha*, 462 U.S. at 952, 954 (discretion delegated statutorily to I.N.S. to decide whether to suspend individual immigrants' deportations by hearings before immigration judge, based on specified decisional criteria, was delegated legislative power).

The delegated power of the Commission to institute administrative enforcement actions against targets—instead of Article III actions—clearly alters the legal rights, duties and relations of those targets. *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 593 (1985) (agency administrative adjudications "surely determine liabilities of individuals").

Prior to Dodd-Frank, SEC enforcement actions against unregulated parties—ordinary citizens—seeking the imposition of harsh penalties were reserved to Article III courts, where targets received full constitutional protections, like the Seventh Amendment right to a jury trial and other vital procedural safeguards. Administrative adjudications were permitted only against (1) registered parties who had voluntarily submitted to SEC regulation and (2) unregulated parties for

24

the imposition of non-punitive remedies like a cease-and-desist order or a censure.[16]   Dodd-Frank's delegation to the Commission of administrative enforcement authority coextensive with judicial enforcement powers, coupled with standardless authority to choose an administrative forum to pursue the cases previously reserved to the judicial branch, vested the Commission with unprecedented power to determine the constitutional and procedural rights afforded to targets of enforcement action.[17]   Under Supreme Court separation-of-powers jurisprudence, the delegation to exercise this new administrative enforcement

---

[16] *See* Securities Enforcement Remedies and Penny Stock Reform Act of 1990 (Pub. L. 101-429 (1990), hereinafter, the "1990 Act") §§ 202; 301; and 401 (allowing for the imposition of civil monetary penalty in SEC cease-and-desist proceedings for violations of specific provisions under the Exchange, Advisor, and Company Acts.  Notably, the 1990 Act did not authorize civil monetary penalties for violations of the Securities Act to be awarded in administrative proceedings.

[17] *See* Dodd-Frank Wall Street Reform and Consumer Protection Act (Pub. L. No. 111-203 (2010), hereinafter, "Dodd-Frank") § 929P(a)(1) (allowing the SEC to pursue civil monetary penalties in any cease-and-desist proceeding initiated under the Securities Act where it could not prior to the passage of Dodd-Frank); § 929P(a)(2)(E) (allowing the SEC to pursue civil monetary penalties in any cease-and-desist proceeding initiated under the Exchange Act where the SEC was limited to seeking monetary penalties in limited circumstances prior to the passage of Dodd-Frank); § 929P(a)(3)(E) (allowing the SEC to seek civil monetary penalties in proceedings initiated under subsection "f" of Section 9 of the Company Act— subsection "f" of Section 9 of the Company Act allows the SEC to initiate a cease-and-desist proceeding against "any person" for a violation of the Company Act); and § 929P(a)(4)(E) (allowing the SEC to seek civil monetary penalties in proceedings initiated under subsection "k" of Section 203 of the Investors Act— subsection "k" of Section 203 of the Adviser Act allows the SEC to initiate a cease-and-desist proceeding against "any person" for a violation of the Adviser Act).

25

authority was legislative.

**B.     Congress May Transfer its Power to Assign Certain Statutory Enforcement Claims for Exclusive Adjudication in an Administrative Forum Only Where it Imposes Specific Guidelines or an "Intelligible Principle" for Exercising that Delegated Authority.**

The Supreme Court has ruled that, when lawmakers confer such decision-making authority upon executive agencies, Congress must "lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." *Whitman*, 121 S. Ct. at 912, quoting *J.W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 409 (1928).

To justify the power vested in Congress to designate certain categories of government claims for litigation exclusively in an administrative forum, the Supreme Court has deferred to the legislative branch and its judgment that the specialized expertise of regulatory agencies was necessary for the administration of the modern bureaucratic state. *See Granfinanciera, S.A., v. Nordberg*, 492 U.S. 33 (1989); *Atlas Roofing Co. v. OSHA* , 430 U.S. 442 (1977).

But central to the Court's tolerating this circumscribed power-shifting authority in the legislative branch is that Congress's relegation of such classes of disputes to administrative adjudication is to be "exclusive." The Court has repeatedly stressed that "when Congress creates procedures 'designed to permit agency expertise to be brought to bear on particular problems,' those procedures

26

'are to be exclusive.'" *Free Enterprise*, 561 U.S. at 489; *Whitney Nat'l Bank in Jefferson Parish v. Bank of New Orleans & Trust Co.,* 379 U.S. 411, 419-20 (1965). The boundaries required by the exclusivity of legislatively-created administrative procedures were uniquely lifted by Dodd-Frank, however, leaving it to the Commission to decide for itself which procedures are "to be brought to bear" in the enforcement of securities statutes.

In addition to the "exclusivity" requirement—assuring that only Congress exercises the power to classify enforcement remedies to be pursued through administrative procedures—the Court consistently demands that delegated agency decision-making be constrained by measurable standards, preventing agencies from usurping Congress' constitutional functions or misapplying the delegated power. The scope of the authority delegated defines the degree to which Congress must impose more or less detailed criteria to put an effective "leash" on the transferred power. *See*, *Whitman,* 121 S. Ct. at 475 ("the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred"); *Loving,* 517 U.S. at 772-773; *United States v. Mazurie,* 419 U.S. 544, 556-557 (1975).

Adjudication and rule-making activities by the agencies have been long governed by the Administrative Procedure Act ("APA"). The Court has noted repeatedly that the APA represented an effort by Congress to provide some of

those procedural constraints—and it partially succeeded.  As Justice Kennedy recently explained in *F.C.C. v. Fox Television Stations, Inc.*, "the APA was a 'working compromise, in which broad delegations of discretion were tolerated as long as they were checked by extensive procedural safeguards'." 556 U.S. 502, 537 (2009) (Kennedy, J, concurring), quoting R. Stewart & C. Sunstein, *Public Programs and Private Rights*, 95 HARV. L.REV. 1193, 1248 (1982).  Where agencies are permitted unbridled discretion, their actions violate important constitutional principles of separation of powers and checks and balances. To that end the Court has consistently mandated that Congress' delegation of lawmaking power to an agency must be "specific and detailed." *Mistretta v. United States,* 488 U.S. 361, 374 (1989).  Congress must "clearly delineat[e] the general policy" an agency is to achieve and must specify the "boundaries of [the] delegated authority." *Id.*   Congress must "'lay down by legislative act an intelligible principle,'" and the agency must follow it.  *Id.* at 372 (quoting *J.W. Hampton,* 276 U.S. at 406).

In Dodd-Frank, Congress has handed the SEC's Commissioners a blank check, providing no limits to confine or control the discharge of that authority. The transfer of that unconstrained and unreviewable legislative power violates the separation of powers, vitiating the underlying proceedings against Jarkesy.

28

**C.    In Delegating Authority to the Commission to Decide Which Categories of Enforcement Cases Will be Adjudicated Administratively, Congress Failed to Provide an Exclusive Procedure or Any "Intelligible Principle" to Constrain the Commission's Decisions.**

The Supreme Court has never allowed the core legislative prerogative to relegate certain classes of controversies to non-Seventh Amendment adjudication to be delegated by Congress to the executive branch, much less to the very agency pursing an enforcement action.   Supreme Court precedent establishes that the enabling legislation at issue here improperly transferred the legislative authority of Congress to the executive branch.

In SEC enforcement actions initiated post-Dodd-Frank, there is *no* statutory standard governing the exercise of executive decision-making in selection of a forum, nor is there any legislative history from which any "intelligible principle" can be divined by implication.[18]   The SEC admitted the lack of any statutory "intelligible principle" during proceedings in the court below, stating:

> Congress . . . did not provide any criteria as when the Commission would or should do one versus the other [federal court action or administrative proceeding]. It's entirely left to the Commission's discretion.  The Commission decides – does not have formal criteria. The Commission decides on a case-by-case basis, based on everything before it, which route it might want to follow.

---

[18]   The Supreme Court has stated that the guidelines need not necessarily be explicit in the enabling legislation, allowing resort to legislative history. "Although FIFRA's language does not impose an explicit standard, the legislative history of [the amendments at issue] is far from silent." *Union Carbide,* 473 U.S. at 593.

29

(A236-37)

The extraordinary delegated power to summarily and unilaterally dispatch a citizen's constitutional rights—otherwise available in an Art. III proceeding—by casting him instead into the administrative process for adjudication may now, under Dodd-Frank, be rendered by nothing less frivolous than a flip of a coin, the drawing of straws, or the throwing of darts. This does not comport with the rudiments of due process or the tenets of our constitutional structure. Where property and liberty interests are being adjudicated, due process requires a hearing on governmental action affecting those interests. *See Mathews v. Eldridge*, 424 U.S. 319, 334 (1976); *Armstrong v. Manzo*, 380 U.S. 545, 552 (1964). "The courts, when a case or controversy arises, can always 'ascertain whether the will of Congress has been obeyed,' *Yakus v. United States,* 321 U.S. 414, 425 (1944), and can enforce adherence to statutory standards. *See Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 584-87 (1952); *Ethyl Corp. v. EPA,* 541 F.2d 1, 68 (D.C. Cir.) (en banc) (separate statement of Leventhal, J.), *cert. denied,* 426 U.S. 941 (1976)." *Chadha*, 462 U.S. at 953-54.

But in the case of the legislative power uniquely delegated to the SEC by Dodd-Frank, there is no way for an Article III court to "ascertain whether the will of Congress has been obeyed," because there are utterly no "statutory standards" to enforce. Constitutionally, the resulting legislative scheme is fatally flawed for

failure to prescribe exclusive forum-selection parameters, or a guiding "intelligible principle," to circumscribe and govern the Commission's discharge of this extraordinary power, or, since the discretion is unbridled, any opportunity for judicial review.

The lack of any "intelligible principle" runs afoul of both the due process protections of the Fifth Amendment and the doctrine of separation of powers, invalidating the Commission's decision to prosecute its claims against Jarkesy in its own administrative tribunal. This Congressional grant of unconstrained power to the SEC cannot survive judicial review.

## II.  THE DODD-FRANK STATUTORY PROVISIONS AUTHORIZING IMPOSITION AND COLLECTION OF ENHANCED PENALTIES IN ADMINISTRATIVE ENFORCEMENT PROCEEDINGS VIOLATE THE SEVENTH AMENDMENT.

All modern federal regulatory statutes include civil enforcement programs. In certain statutes, administrative agencies are given exclusive jurisdiction to adjudicate statutory violations and fashion remedies that may include fines or penalties.  In other statutes, Congress has provided for both judicial and administrative enforcement. Where Congress has established separate judicial and administrative enforcement programs, penalty amounts have often been capped in administrative proceedings, reflecting their remedial focus, but not in judicial programs in which punitive considerations affect penalty amount. If these

administrative programs were to authorize an agency to adjudicate common law claims for which there would be a Seventh Amendment right to a jury trial, that statutory authorization would be unconstitutional on its face. *Cf. N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982).

*Atlas Roofing,* 430 U.S. at 453 (1977), held that Congress may constitutionally delegate to an executive agency authority to adjudicate compliance with regulatory requirements under a statutory provision that intertwines the grant of equitable relief with the assessment of remedial penalties. Adjudications of these newly created statutory "public rights" do not involve "'a suit at common law … [nor are they] in the nature of such a suit. The proceeding is one unknown to the common law. It is a statutory proceeding.'" *Id.* at 453 (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 48-49 (1937)). As a result, no jury is required to adjudicate such "public right" claims like the one in OSHA, where penalties are included in the remedial measures being adjudicated. *Id.* at 458-61.

In contrast, where Article III courts are authorized to assess civil penalties that may be punitive in nature under a provision that does not intertwine penalties with equitable remedies, adjudicating these penalties is grounded in common law, and gives rise to Seventh Amendment rights. As the Supreme Court in *Tull v. United States* observed, "[a]ctions by the Government to recover civil penalties under statutory provisions … historically have been viewed as one type of action in

debt requiring trial by jury." 481 U.S. 412, 418-419 (1987). In holding that an action to impose civil penalties under the Clean Water Act involved resolution of a common law claim covered by the Seventh Amendment, the Court relied upon the "punitive nature of the relief sought" and the fact that the Clean Water Act enforcement section "does not intertwine equitable relief with the imposition of civil penalties. Instead, each kind of relief is separately authorized in a separate and distinct statutory provision." *Id.* at 425. The penalty provisions established by Dodd-Frank parallel the Clean Water Act penalties before the Court in *Tull.*

Dodd-Frank fundamentally changed SEC enforcement under the primary acts of the federal securities laws. Prior to Dodd-Frank, unregistered individuals in administrative enforcement proceedings only were subject to SEC non-punitive sanctions, like a cease-and-desist order.[19] Dodd-Frank amended those statutes to authorize, in addition to equitable relief, separate and enormous civil penalties, and now allows the imposition of monetary "per violation" penalties that are identical to, *or greater than*, the statutory provision governing judicially imposed civil penalties for identical securities law violations. Under the Securities Act, for example, maximum per-violation administrative penalties are 50 percent greater than what Article III courts may impose per violation.[20]

---

[19]  *See supra*, p. 23-4.

[20]  *See supra*, p. 7 n. 2.

In giving the SEC unprecedented power to assess the civil penalties that are punitive in nature and are imposed under a separate statutory provision focused exclusively on adjudicating liability for penalties (in contrast to a statutory provision, such as the one before the Supreme Court in *Atlas Roofing*, where penalties are intertwined with remedial measures), Dodd-Frank transformed the SEC administrative enforcement program for ordinary, unregistered persons like Jarkesy into a penalty-collection program that is indistinguishable from the Water Act penalty program before the Supreme Court in *Tull*.  Because the Dodd-Frank administrative penalty provisions are functionally identical to the Clean Water Act provision in *Tull*, they violate the Seventh Amendment and render the pending administrative action against Jarkesy unlawful.

**III**.    **THE SEC'S ADMINISTRATIVE ENFORCEMENT PROCEEDINGS AGAINST JARKESY ARE VOID FOR PREJUDGMENT, IN VIOLATION OF JARKESY'S DUE PROCESS RIGHTS.**

It is axiomatic that "[a] fair trial in a fair tribunal is a basic requirement of due process, *In re Murchison,* 349 U.S. 133, 136 (1955), and that principles of due process apply to administrative adjudications."  S*ee Amos Treat & Co. v. SEC,* 306 F.2d 260, 264 (D.C. Cir. 1962).  The Commission violated this basic requirement of due process by issuing an *ex parte* order *finding* guilt months before *trying* the contested facts on which violations against Jarkesy were alleged.

34

The case was initiated with the Order Instituting Proceedings, which assigned the matter to an ALJ and stated: "After an investigation, the Division of Enforcement **alleges that:,**" and then narrated the Division's allegations against all of the respondents.[21] Some months later, but before the Commission or ALJ ever convened a hearing or considered any evidence on the allegations, the co-respondents entered into a settlement agreement with the Commission. Upon reaching that agreement, the Commission issued an extraordinary *ex parte* order that departed from normal protocol by including numerous *findings against Jarkesy,* adjudicating the very allegations that due process demanded be given "a fair trial in a fair tribunal." The Commission took the Enforcement Division's allegations—almost verbatim—from the Order Instituting Proceedings, adopted them as factual findings, and entered the Order Approving Settlement with third parties that included 86 *ex parte* findings of fact and conclusions of law against Jarkesy.[22] Among these 86 findings, the Commission found as to the Manager (Appellant Jarkesy) and the Adviser (Appellant Patriot28)[23]:

- This case concerns fraudulent conduct by the manager (the "Manager") of two hedge funds known as the John Thomas Bridge and Opportunity Fund

---

[21]   Included in the Appendix at A092, and also available at http://www.sec.gov/litigation/admin/2013/33-9396.pdf  (emphasis added).

[22]   A124-130.

[23]   *Id.*

LP I and the John Thomas Bridge and Opportunity Fund LP II (together, the "Funds"), and the Funds' adviser (the "Adviser").

- The Manager and the Adviser elevated the interests of the Respondents over those of the Funds by paying or causing to be paid excessive monies to [the co-respondent] that should have remained with the Funds.

- The [claimed] independence of the Adviser and [the co-respondent] was untrue.

- The Adviser made no disclosure that [the co-respondent] would become involved in the Adviser's investment activities.   To the contrary, the Adviser—acting through the Manager—represented that it was solely responsible for managing the Funds and independent from [the co-respondent].

- In breach of his fiduciary duty to the Funds, the Manager, through his role at the Adviser, actively negotiated fees on behalf of [the co-respondent] in connection with the Funds' activities to the detriment of the Funds.

- The Manager abandoned his fiduciary duties to the Funds and negotiated arrangements whereby the borrowing companies—in which the Funds were invested and from which the Funds sought repayment—would pay unwarranted finder fees to [the co-respondent] out of the proceeds received from the Funds.  Thus the Manager of the Funds, when negotiating bridge loans between the Funds and the borrowing companies, placed the interests

36

of Respondents above the interests of the Adviser's clients, the Funds, and

assumed responsibility for negotiating on behalf of [the co-respondent].

- As a result of the conduct described above, [the co-respondent] willfully

  aided and abetted and caused the Adviser's and the Manager's violations of

  Section 206(2) of the Advisers Act. (footnote reference omitted)

Having made these findings well before Jarkesy's "trial" was begun and

without Jarkesy being afforded any opportunity to rebut the allegations, Jarkesy

could not possibly receive a fair trial in a fair tribunal. This premature adjudication

of Jarkesy's guilt, two months *before* the hearing on the merits, effectively

resolved liability for all of the disgorgement and penalties sought by the Division

in the Order Instituting Proceedings.  It made a mockery of the administrative

adjudicatory process, and indeed rendered Jarkesy's "defense" in the adminis-

trative procedure a fool's errand.

The Order Approving Settlement—which was published on the SEC's

official website—was extraordinary and departed from the Commission's usual

practice.[24]   The SEC is empowered to settle pending enforcement actions by 5

U.S.C. § 554(e),[25] which simply requires entry of a "declaratory order" to

---

[24]  See http://www.sec.gov/litigation/admin/2013/34-70989.pdf

[25]   5 U.S.C. § 554(e), provides in its entirety that "[t]he agency, with like effect as
in the case of other orders, and in its sound discretion, may issue a declaratory
order to terminate a controversy or remove uncertainty."

memorialize the termination of the controversy.  No statute or rule requires such orders to include anything other than that a settlement has been approved terminating the matter as to the settling respondents.   No authority permits inclusion of detailed *ex parte* findings of fact and conclusions of law against third parties.

By finding Jarkesy guilty before his trial, the SEC invalidated its proceedings *per se*, rendering his trial null and void.  To the extent that the Commission's prejudgment is apparent on the face of the record, requiring no additional factual development, this Court should declare the underlying administrative proceedings void as a matter of law, end the ongoing constitutional injury to Jarkesy and uphold the public interest in the SEC's faithful adherence to basic constitutional requirements.  *See, e.g., Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (a constitutional violation and loss of constitutional protections '"for even minimal periods of time, unquestionably constitutes irreparable injury"') (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977) ("there is an overriding public interest…in the general importance of an agency's faithful adherence to its statutory mandate").

Judicial condemnation of agency bias through prejudgment is well established in this Court.  Taint manifested by expressions of bias by even a *single*

commissioner is grave. Even pre-decisional recusal of the offending commissioner cannot revive the fairness of the proceedings. The appropriate remedy is to vacate all tainted prior proceedings followed by a whole new adjudication, assuming sufficient commissioners remain to ultimately decide the case.

The keystone of the SEC's administrative adjudication structure is the Commission itself. The Commission sits as a super-appellate tribunal and reviews *de novo* the evidence, rulings and conclusions of the ALJs following administrative hearings. The ultimate "judge" is the Commission; only the Commission's final decision on "appeal" becomes an enforceable and appealable judgment. As such, the Commission, and each of its five members, must scrupulously avoid any bias or appearance of bias while proceedings are pending up until its final decision is made, remaining "neutral and detached adjudicator[s]." *Ass'n of Nat'l Advertisers, Inc. v. F.T.C.*, 627 F.2d at 1168

A biased Commission or a single biased Commissioner—one who has decided a respondent's guilt, or even *appears* to have done so—is disqualified as a matter of law, nullifying the proceeding. Without a valid sitting Commission, there is no qualified decisional body left to review the "trial" conducted before the ALJ, no possibility of a legally valid, binding Commission order, and thus no final order from which to seek judicial review. The Commission's disqualification decapitates the administrative process.

In *Antoniu v. S.E.C.*, 877 F.2d 721 (8th Cir. 1989), *cert. denied,* 494 U.S. 1004 (1990), a single SEC commissioner made published pre-hearing statements about Mr. Antoniu—who had recently been convicted of securities fraud—and commented favorably on the Commission's position in the administrative proceeding against Antoniu.  *Id.*  That commissioner, Charles C. Cox, made those statements in a speech in Denver *after* the SEC initiated administrative proceedings against Antoniu and *while* his statutory disqualification hearing before an ALJ was pending.  *Id.*  The Commission was seeking a lifetime ban from securities-related employment.  *Id.*

Commissioner Cox's speech was printed and distributed by the SEC.  Mr. Antoniu moved to disqualify the entire Commission based on the pre-decision bias evident from the Cox speech.  His motion was denied, and Commissioner Cox initially refused to recuse himself from further involvement in the case. *Id*. at 723. Some eighteen months later—the day the Commission issued its decision affirming the ALJ's initial decision granting a lifetime ban—Commissioner Cox recused himself, presumably from the final deliberation and Commission vote.[26]  *Id.*

This Court was resolute in finding the proceeding against Mr. Antoniu devoid of due process.  *Id.*  Noting first "the fundamental premise that principles of

---

[26]  The Commission thought so little of Antoniu's prejudgment complaint that the opinion and order did not even acknowledge or discuss it.  *See In the Matter of Adrian Antoniu,* 48 S.E.C. 909, Admin. Proc. File No. 3-6566 (1987).

due process apply to administrative adjudications, [*s*]*ee Amos Treat & Co.,* 306 F.2d at 264," the Court recited the Supreme Court's description of the minimal rudiments of due process from *Murchison,* 349 U.S. at 136: "A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases." *Antoniu*, 877 F.2d at 724.

Most importantly, the *Antoniu* court pointed out, "the Supreme Court has demanded not only a fair proceeding, but also that 'justice must satisfy the *appearance* of justice.'" *Id.* (quoting *In re Murchison,* 349 U.S. at 136, (citing *Offutt v. United States,* 348 U.S. 11, 14 (1954))) (emphasis supplied). So the relevant inquiry was "whether Commissioner Cox's post-speech participation in the … proceedings comported with the appearance of justice." *Id.* This Court concluded:

> After reviewing the statements made by Commissioner Cox, we can come to no conclusion other than that Cox had "in some measure adjudged the facts as well as the law of a particular case in advance of hearing it." *Gilligan, Will & Co. v. SEC,* 267 F.2d 461, 469 (2d Cir.), *cert. denied,* 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959). Even though Cox recused himself prior to the filing of the SEC's final decision, there is no way of knowing how Cox's participation affected the Commissioner's deliberations. Accordingly, **we nullify all Commission proceedings** (including the Commission's rejection of Antoniu's proposed settlement) in which Commissioner Cox participated occurring after Commissioner Cox's speech was given and remand the case to the Commission with directions to make a de novo review of the evidence, without any participation by Commissioner Cox. It is so ordered.

*Id.* at 726 (emphasis supplied).

In contrast to this case, the *Antoniu* court confronted only one commissioner who had "adjudged the facts as well as the law of a particular case in advance of hearing it." As such, the matter could be remanded to the Commission with orders to start over and exclude the biased commissioner from any involvement. In Plaintiffs' case, the *entire Commission*, as a body, "adjudged the law as well as the facts" in great depth, well before Jarkesy's hearing. No remand can meet the fundamental demands of due process: "a fair trial in a fair tribunal." Neither the Constitution nor the APA provide an alternative process for *administrative* adjudication when the agency's own actions disqualify it *en toto*.

Significantly, only two other reported cases—both D.C. Circuit opinions—address a preserved complaint about commissioner prejudgment of a federal agency decision. Both were cited by the *Antoniu* court, and both reached exactly the same conclusion. In *Texaco, Inc. v. Federal Trade Commission,* Texaco and B.F. Goodrich faced an administrative hearing on charges they violated the FTC Act by coercing Texaco dealers to distribute Goodrich products through a commission agreement between the two companies, disadvantaging competing rubber companies. 336 F.2d 754 (D.C. Cir. 1964), *vacated on other grounds,* 381 U.S. 739 (1965). Just as in *Antoniu*, a commissioner—new FTC Chairman Dixon—gave a speech in Denver to a convention of petroleum retailers expressing the Federal Trade Commission's intent to crack down on anti-competitive

42

practices.  Stating a disinterested observer could conclude that the commissioner had "in some measure" prejudged the specific case before him, stripping from the proceedings the "very appearance of complete fairness"—this Court was again resolute, ruling that the commissioner's "participation in the hearing amounted in the circumstances to a denial of due process which invalidated the order under review." *Id*. at 760.

The D.C. Circuit confronted prejudgment bias yet again in *Cinderella Career & Finishing Schools, Inc. v. Federal Trade Commission.*, a deceptive advertising case where the commissioner publicly denounced the respondents in a pending administrative proceeding although without naming them or even referring to the specific case. 425 F.2d 583 (D.C. Cir. 1970). This Court contrasted the Commission's general authority to comment publicly on pending cases, and the "reason to believe" that alleged violations have occurred, with the types of incriminatory pronouncements that the Commission made here:

> This does not give individual Commissioners license to prejudge cases or to make speeches which give the appearance that the case has been prejudged. Conduct such as this may have the effect of entrenching a Commissioner in a position which he has publicly stated, making it difficult, if not impossible, for him to reach a different conclusion in the event he deems it necessary to do so after consideration of the record. There is a marked difference between the issuance of a press release which states that the Commission has filed a complaint because it has 'reason to believe' that there have been violations, and statements by a Commissioner after an appeal has been filed which give the appearance that he has already prejudged the case and that the ultimate determination of the merits will move in

43

> predestined grooves. While these two situations—Commission press releases and a Commissioner's pre-decision public statements—are similar in appearance, they are obviously of a different order of merit.

*Id*. at 590.  This Court invalidated the Commission's proceedings while noting that it was of no moment that the public statements did not specifically refer to the respondents:  "the reasonable inference a disinterested observer would give these remarks would connect them inextricably with this case."  *Id*. at 590 n. 10.

The Commission's prejudgment in this case makes pikers of those who uttered bias in the *Antoniu, Texaco and Cinderella* cases discussed *supra*.  Here, the *entire Commission* has issued a published Order that makes extensive *ex parte* findings that establish as fact virtually all of the Enforcement Division's unproven allegations in the Order Instituting Proceedings *as true and correct,* and has adjudged the Manager (Appellant Jarkesy) and Adviser (Appellant Patriot28) to have violated the law as charged.  The verdict was in before the trial began.

The SEC well knows the risk and fatal effect of prejudgment bias in administrative adversarial proceedings.  The agency's Rules of Practice demand a "prejudgment waiver" *in advance of* every settlement of an administrative proceeding, as well as in other circumstances that affect the settlement of an administrative proceeding.  17 C.F.R. § 201.240.  When respondents settle, the Rules *require* waiver of: (1) the rules and other legal impediments preventing the SEC staff from communicating directly with and advising the Commission as to

any "order, opinion, finding of fact, or conclusion of law to be entered pursuant to the offer" of settlement, and (2) any right to claim bias or prejudgment by the Commission based on the consideration of or discussions concerning settlement of all or any part of the proceeding. *Id.* The validity of claims of bias or prejudgment is enshrined by this rule.

The SEC's pre-hearing guilty verdict requires recusal of the Commissioners and nullifies the administrative proceedings against Plaintiffs. Jarkesy vigorously presented this grave error directly to the Commission,[27] in one of several futile attempts to timely resolve the due process violations inside the administrative process, but the Commission on January 28, 2014, the day before Jarkesy filed this lawsuit, refused to even recognize the disqualification.

This Court correctly presaged in *Cinderella* that premature statements of guilt by commissioners would "give the appearance …  that the ultimate determination of the merits will move in predestined grooves." 425 F.2d at 590. Under this Court's precedents, the ongoing administrative enforcement proceedings against Jarkesy are void—and have been since at least December 5, 2013. Because the prejudgement claim "involves no disputed factual issues that demand the creation of a better … record," this Court should so hold and declare such

---

[27] The ALJ rejected Jarkesy's motion for recusal and dismissal on these grounds, in the face of the controlling authorities cited herein, as "frivolous" and "baseless" (A138, A140), a decision that the Commission affirmed on January 28, 2014. *See* https://www.sec.gov/litigation/ opinions/2014/33-9519.pdf.

proceedings a nullity.  *Ass'n of Nat'l Advertisers, Inc.*, 627 F.2d at 1156

## IV.   JARKESY'S "SEPARATION OF POWERS / DUE PROCESS" AND SEVENTH AMENDMENT FACIAL CONSTITUTIONAL CLAIMS WERE PROPERLY BEFORE THE COURT, REQUIRING THEIR RESOLUTION.

As discussed extensively *supra* at 22-31, the new statutory scheme purporting to delegate to the Commission the unbridled, unilateral and unreview-able power to dispatch a citizen's constitutional rights by casting that citizen into its internal courts violates the separation of powers and the targeted citizen's due process rights.  As discussed *supra* at 31-34, the power vested in the Commission by Dodd-Frank, which allows it to force ordinary citizens to defend complex civil fraud prosecutions for substantial penalties without the benefit of a jury, contravenes the requirements of the Seventh Amendment.  Both of these are "facial" constitutional challenges which this Court has jurisdiction to resolve.

The court below incorrectly characterized Jarkesy's facial constitutional claims as claims that must be exhausted administratively and heard by a circuit court on review of a Commission Final Decision.  The court was wrong as was the SEC in earlier pleadings before this Court.[28]

---

[28]   *See* Mem. Op. at 11.  The SEC has attempted to advance this mischaracteri-zation even in this Court, asserting that neither Jarkesy's "Complaint [n]or .. any other part of the record ... show[s] that these facial arguments were raised below." SEC Motion for Summary Affirmance at 9.  (Dkt. 1514130)  To the contrary, these facial arguments were raised in the complaint and at length in the pre- and post-

Jurisdiction to resolve facial challenges does not have to await exhaustion of remedies. The court below recognized that the exhaustion doctrine "does not apply" when a plaintiff "is making a facial challenge to a statute… ." Mem. Op. at 11, citing *General Electric v. EPA*, 360 F.3d 188, 191 (D.C. Cir. 2004) (per curiam). *See also, McNary v. Haitian Refugee Center, Inc.,* 498 U.S. 479, 492 (1991) (statutory scheme did not divest court of jurisdiction to entertain "general collateral challenges to unconstitutional practices and policies used by the agency"); *Johnson v. Robison,* 415 U.S. 361 (1974) (statutory provision barring review of individual veterans' benefit determinations did not bar constitutional challenge to statute itself); *Elk Run Coal Co. v. U.S. Dep't of Labor*, 804 F. Supp. 2d 8, 19-21 (D.D.C. 2011) (jurisdiction lay to hear due process claims, which presented facial challenges that fall outside the statutory review scheme); *Live365, Inc. v. Copyright Royalty Bd.*, 698 F. Supp. 2d 25, 33-34 (D.D.C. 2010) (district court had jurisdiction over a facial challenge to the constitutionality of a statute). The district court's mischaracterization of these claims led its dismissal for lack of subject matter jurisdiction.  Jarkesy's facial claims involve questions of law that in the interests of justice should be resolved now by this Court.

---

hearing briefing.  Jarkesy expressly labeled the denial of his Seventh Amendment rights through the separation of powers violation as "a challenge solely to the facial validity of [the] statutory scheme," noting also that he was raising "apparently a constitutional issue of first impression."  (A263, A264)

## V.   JARKESY'S "AS APPLIED" EVIDENCE-BASED CLAIMS WERE PROPERLY BEFORE THE DISTRICT COURT, REQUIRING THEIR JUDICIAL RESOLUTION.

In the court below Jarkesy alleged sufficient facts to establish two constitutional violations by the SEC that vitiate the underlying administrative proceedings and entitle him to the equitable relief requested under 5 U.S.C. § 702:

### A.    Equal Protection Claim Requires District Court Discovery.

Jarkesy's complaint alleged that his Equal Protection rights have been trampled by the SEC's arbitrary and irrational decision—motivated in material part by animus against Jarkesy—to send him into the disadvantageous administrative process, where his ability to defend himself has already been, and will continue to be, severely prejudiced. (A016-17) Other, identical targets of the SEC's enforcement regime had, within a few months of Jarkesy's case, been sued instead in federal court, where all applicable constitutional amendments and rules of procedure are applied with force to permit a defense on a level playing field. Jarkesy properly alleged and identified multiple "comparators," other SEC enforcement targets charged under the very same statutes whose cases were instead pursued by the Commission through litigation in federal court.  Under the so-called "class of one" equal protection doctrine, Jarkesy would be entitled to relief, but this is an evidence-based claim for which Jarkesy must first develop an adequate evidentiary record.

48

**B.    If the Commission Prejudgment Claim is Not Resolved as a Matter of Law, a Remand is Required for District Court Discovery.**

As discussed *supra* at 34-45, Jarkesy's complaint alleged sufficient facts— uncontroverted by the SEC—to establish that the Commission's December 5, 2013, order containing some 86 findings of fact against him and one incriminating conclusion of law against him, just as alleged in the Order Instituting Proceedings, constituted prejudgment and rendered the administrative proceeding void.

This  Court can hold as a matter of law that these findings have nullified the proceeding.  If the SEC alleges that facts are in dispute, then Jarkesy is entitled to a remand to adduce further evidence in support of the claim.[29]

**C.    Subject Matter Jurisdiction in the District Court:  The "Generous" Waiver of Sovereign Immunity in 5 U.S.C. § 702.**

Along with all of Jarkesy's other claims, the district court dismissed for lack of subject matter jurisdiction by ignoring 5 U.S.C. § 702 and then misapplying the

---

[29]   In the event of remand substantial discovery would also be required in support of Jarkesy's ancillary claim, (A014-15 §§ 23-27) that the Commission's order was the product of illegal *ex parte* communications it had with the Enforcement Division staff in direct violation of 5 U.S.C. § 554(d)(2), which would likewise invalidate the administrative proceeding.  Section 554(d)(2) provides in pertinent part:  "An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 557 of this title, except as witness or counsel in public proceedings."  This claim cannot be substantiated without extensive district court discovery.

"exhaustion of remedies" test in *Free Enterprise,* 561 U.S. at 489-92, and *Thunder Basin*, 510 U.S. at 212. A majority of the other district courts which have entertained equal protection challenges to ongoing SEC administrative proceedings have affirmed their jurisdiction to hear such claims, ruling that because such evidence-based claims cannot be meaningfully litigated through the administrative process—or litigated at all—the APA does not preclude district court intervention. *Arjent LLC v. SEC,* 7 F. Supp. 3d 378, 383 (S.D.N.Y. 2014); *Gupta v. SEC,* 796 F. Supp. 2d 503, 513-14 (S.D.N.Y. 2011). Both *Arjent* and *Gupta* held that the *Free Enterprise* guidelines are no impediment to subject matter jurisdiction to entertain an "as applied" claim alleging equal protection violations in the conduct of ongoing SEC administrative proceedings, because these are "evidence-based" constitutional claims and "the SEC has no administrative procedure for raising such a claim." *Arjent,* 7 F. Supp. 3d at 384 (because "the SEC has no administrative procedure for raising such a claim, a finding of preclusion would foreclose all judicial review"); *Gupta,* 796 F. Supp. 2d at 513-14 (the "SEC's administrative machinery does not provide a reasonable mechanism for raising or pursuing such a claim," as "no administrative record bearing on this claim will be developed for any federal appellate court to review").

Congress has enacted an express waiver of sovereign immunity for suits seeking equitable remedies against federal agency actions, including proceedings

conducted under the APA.  Specifically, 5 U.S.C. § 702[30] provides that an

> action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

It has long been settled that Section 702 waives sovereign immunity for actions against an agency, such as Jarkesy's claims here, that seek relief other than money damages, such as injunctive or declaratory relief.  *See Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988).  Moreover, "the APA's waiver of sovereign immunity applies to any suit whether under the APA or not" because Section 702 "waives sovereign immunity for [any] action in a court of the United States seeking relief other than money damages," not solely for an action brought under the APA. *Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006) (internal quotation marks omitted).  The Supreme Court has emphasized that the APA's "'generous review provisions'" must be given a "'hospitable'" interpretation in favor of judicial review. *Bowen,* 487 U.S. at 904 (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 140-41 (1967)).  Indeed, so expansive is the APA's waiver of sovereign immunity that the Court has long ago instructed the district courts that jurisdiction

---

[30] The statute was first enacted in 1966, but was amended ten years later to specifically remove the defense of sovereign immunity as a bar to judicial review of federal administrative action otherwise subject to judicial review.

could be defeated only in the face of "clear and convincing evidence" of a contrary legislative intent.  *Abbott Labs.*, 387 U.S. at 141.

Whether such "contrary legislative intent" is manifest for a particular claim has more recently come to be measured by a three-pronged test.  In *Thunder Basin Coal Co. v. Reich*, the Court explained that statutory provisions for agency review—such as 15 U.S.C. §§ 78u-3 and 78y(a)(1), relied upon by the court below—do *not* restrict judicial review unless the "statutory scheme" displays a "fairly discernible" intent to limit jurisdiction, and the claims at issue *"are of the type Congress intended to be reviewed within th[e] statutory structure." Thunder Basin*, 510 U.S. at 207, 212 (1994) (emphasis supplied).  To give effect to these principles, the Court articulated three factors for analysis, a litmus test reaffirmed in *Free Enterprise*:

> (1) requiring exhaustion "could foreclose all meaningful judicial review"
> (2) the suit is "wholly collateral to a statute's review provisions" and
> (3) the claims are "outside the agency's expertise."

*Free Enterprise*, 561 U.S. at 489 (citations omitted), and *Thunder Basin*, 510 U.S. at 211-14.   Jarkesy's claims in this case each fall squarely within the *Free Enterprise*/*Thunder Basin* formulation.

### (1)    Possible foreclosure of all meaningful judicial review.

The courts have recognized that the nature of the claim dictates the availability of judicial review through the agency's administrative procedures.

There is no procedural mechanism for the necessary development of evidence in support of the claims under the SEC's Rules of Practice or the Administrative Procedures Act.  Just as in *Gupta,* for these evidence-based claims, judicial review (in the circuit court alone) is therefore impossible.  There is no way to create the necessary record to establish the claim for appellate review.  The *Arjent* and *Gupta* courts pointed out the obvious—that the SEC's administrative process provides no mechanism for developing the evidence necessary to sustain such a claim.  *Arjent,* 7 F. Supp. 3d at 5; *Gupta,* 796 F. Supp. 2d at 513. This point was underscored as Jarkesy nevertheless engaged in a quixotic attempt to litigate his equal protection claim in the administrative proceeding, petitioning the ALJ for subpoenas for the production of records in support of the claim.  The ALJ summarily denied the subpoenas after the Enforcement Division objected that the equal protection issues—along with the other constitutional claims—were of "absolutely no relevance" to the administrative process.  (A264)

There can thus be no adequate evidentiary record on which Jarkesy can present this equal protection, prejudgment and *ex parte* communications claims to a circuit court under the statutory review process dictated by the APA and the SEC's Rules of Practice. Discovery is necessary in support of evidence-based constitutional claims, such as an equal protection claim, where the gathering of the facts is necessary "to further elucidate the essential issues of th[e] case… ." *Miller*

*v. Caldera*, 138 F. Supp. 2d 10, 12 n.1 (D.C. Cir. 2001). *See also, Greater Baltimore Ctr. for Pregnancy Concerns, Inc., v. Mayor & City Council of Baltimore*, 721 F.3d 264, 282 (4th Cir. 2013) (to properly adjudicate constitutional challenge in an as-applied analysis, the district court was obliged to first afford discovery).

The "class of one" equal protection claim was first expressly and clearly recognized as such by the Supreme Court in *Village of Willowbrook v. Olech:*

> Our cases have recognized successful equal protection claims brought by a "class of one," where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. In so doing, we have explained that "'[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'"

528 U.S. 562, 564 (2000) (per curiam) (citations omitted). Jarkesy's complaint averred that the Commission had treated him "differently [from] persons who are in all relevant respects alike," and identified nine "comparators" identical to Jarkesy in all material respects; all were charged with the same alleged violations and all could have been relegated to the administrative process, but were instead treated differently, according to the complaint, for arbitrary, irrational and

malevolent reasons.[31]   Only through compulsory process can Jarkesy establish his right to prevail on this claim.   The same holds for Jarkesy's Seventh Amendment equal protection claim, even though that issue would subject the Commission's discrim-inatory action to strict scrutiny.

To the extent that the prejudgment claim is not already clearly established by the Commission's December 5, 2013, order, evidence developed through discovery will be necessary to establish the circumstances of the Commission's premature decision against Jarkesy and the unlawful, *ex parte* participation of the Enforcement Division.

Neither the architecture of the APA's administrative adjudicatory process nor the SEC's own rules of practice provide any means for pursuing these evidence-based "as applied" claims, thus providing no avenue of appellate review—much less "meaningful" review—through the statutory review process. The district court's contrary and conclusory ruling—that "plaintiffs will have the opportunity to raise all of their constitutional claims before a Court of Appeals"— is simply wrong and misses the point.   Mem. Op. at 9. (A278)   With no evidentiary support for the claims, any such appeal will be frivolous, subjecting Jarkesy appropriately to the sanctions authorized by FED. R. APP. PRO. 38.   This cannot be what the Supreme Court contemplated by a "meaningful" review.

---

[31]   The complaint included the allegation that the SEC was motivated in part by animus against Plaintiff Jarkesy and his then-co-respondent.   (A107)

55

**(2)    Claims are "wholly collateral to [the] statute's review provisions."**

This factor—overlapping with the first—focuses on the extent to which the issues raised are of the sort that the agency's administrative process normally adjudicates and is capable of adequately addressing.  Thus in *Free Enterprise* the plaintiffs were objecting to the constitutional validity of the Oversight Board's existence, not to any of its auditing standards, and the Court found that issue to be "collateral" to any Commission orders or rules from which review might be sought."  561 U.S. at 490.  In *Gupta*, as in this case, the equal protection claim alleged that the SEC intentionally, irrationally, and illegally singled Gupta out for unequal treatment in a bad faith attempt to deprive him of constitutional and other rights.  The court reasoned that "[t]hese allegations… would state a claim even if Gupta were entirely guilty of the charges made against him in the [Order Instituting Proceedings]."  796 F. Supp. 2d at 513.  Indeed, "even if the SEC were acting within its discretion when it imposed disparate treatment on Gupta, that would not necessarily exculpate it from a claim of unequal protection if the unequal treatment was still arbitrary and irrational." Accordingly, "Gupta's equal protection claim satisfies the ["wholly collateral"] second prong of the *Free Enterprise* test."  *Id.*

The court below reached a different conclusion because it fundamentally misunderstood this element of the *Free Enterprise* formulation, finding that

56

Jarkesy's equal protection claim was "inextricably intertwined with the conduct of the very enforcement proceeding the statute grants the SEC the power to institute and resolve as an initial matter." Mem. Op. at 9. (A278) But inextricable intertwining is not the measure dictated by the Supreme Court, which instead held that a district court has jurisdiction if the claim is "wholly collateral to [the APA's] *review provisions*," not wholly collateral to the proceeding itself. Whatever the court below meant exactly by "inextricably intertwined," there is no question that the Commission's discriminatory treatment of Jarkesy was committed in the course of discharging its new statutory enforcement authority against Jarkesy—*of course* it was. If it were otherwise, Jarkesy would have no standing and would have never raised the claim; indeed, he would have no claim to raise.

The Commission's equal protection violation is wholly collateral to the SEC's securities fraud adjudication and review process because the validity of the claim, and the procedural steps necessary to litigate the claim, are ancillary to that review process. Whether Jarkesy committed securities fraud is wholly collateral to whether the Commission's Order Instituting Proceedings was issued in a discriminatory fashion, and such constitutional litigation is not the focus—or purpose—of the AP process. Jarkesy's equal protection claim easily satisfies this prong of *Free Enterprise*.

### (3)     The claims are outside the agency's expertise.

The district court essentially conceded that the adjudication and resolution of a constitutional equal protection claim was not within the purview of the SEC's legal prowess.  Mem. Op. at 9. (A278)  While the agency may have well mastered the securities regulations it administers, it would be improvident to regard the Commission as a citadel of constitutional scholarship.   Indeed, the five commissioners are not all lawyers, much less lawyers versed in constitutional jurisprudence.[32]

The Supreme Court is in accord.  In *Free Enterprise* the Court held that "constitutional claims are ... outside the Commission's competence and expertise." 561 U.S. at 491.  As to statutory interpretations, when industry expertise is not required and "the statutory questions involved do not require 'technical considerations of [agency] policy,'" they become mere "standard questions of administrative law, which the courts are at no disadvantage in answering." *Id.* That questions of constitutional law—or other legal issues not requiring a particular agency's technical industry-specific expertise—are issues better suited to courts, thereby excusing exhaustion requirements, is an established norm which well pre-dates *Free Enterprise*.[33]

---

[32]   http://www.sec.gov/about/commissioner.shtml#.VJgXbZ3pJUl.

[33]   *See e.g., Adkins v. Rumsfeld*, 389 F.Supp.2d 579, 588 (D. Del. 2005) (interest in

### D. The district court was required to hear both of these "as applied" evidence-based claims.

The district court's misguided *Free Enterprise* analysis—like that of several other courts[34]—also manifests a narrow, mechanical reading of the three prongs with little or no regard for their contextual doctrinal underpinnings or the general presumption in favor of jurisdiction. It is telling that, although the district court devoted most of the memorandum opinion to analysis of subject matter jurisdiction, the touchstone of the jurisdictional analysis here—§ 702—was never once mentioned. The three prongs, first fashioned in *Thunder Basin*, were only meant to guide the courts in "discerning" whether a "contrary legislative intent" could be gleaned from the "generous" waiver of sovereign immunity in § 702 of the APA. *See Bowen,* 487 U.S. at 904. The presumption in favor of subject matter jurisdiction flowing from the sweeping sovereign immunity waiver in § 702 is overcome only where the "statutory scheme" displays a "fairly discernible" intent to limit jurisdiction, and the claims at issue "are of the type Congress intended to be reviewed within th[e] statutory structure." *Thunder Basin*, 510 U.S. at 212.

There is no rational basis to support the conclusion that Congress ever

---

encouraging the use of administrative expertise "not implicated where a constitutional violation is alleged, because such allegations are particularly suited to the expertise of the judiciary").

[34] *See, e.g., Chau v. Sec. & Exch. Comm'n*, Case No. 1:14-cv-1903-LAK (S.D. N.Y. Dec. 11, 2014) (memorandum opinion).

intended industry-specific regulatory agencies to litigate esoteric constitutional claims in the administrative adjudication and review procedures laid out in the APA, much less sit as courts of equity and fashion injunctive and declaratory remedies against themselves. If that were so, it is difficult to imagine a case that could ever be brought pursuant to the "generous" waiver of sovereign immunity in § 702.

The district court's misapplication of *Free Enterprise/Thunder Basin* thereby creates an absurd Catch-22 paradox that both ignores and swallows completely the generous waiver of sovereign immunity in § 702 and ultimately contravenes the central constitutional foundation of judicial review first announced in *Marbury v. Madison*, 5 U.S. 137, 177 (1 Cranch) (1803). Under the district court's formulation, an aggrieved respondent in SEC administrative proceedings cannot press "as applied" constitutional claims for equitable relief in the district court—for lack of subject matter jurisdiction—and likewise cannot press such claims in the SEC administrative prosecution for securities fraud—where no procedures are available to file counterclaims, depose witnesses, fashion equitable remedies, or otherwise create a record to establish these claims—leaving the respondent with utterly no recourse to enjoin even the most egregious of constitutional "as applied" transgressions. This jurisdictional "checkmate" against Jarkesy would effectively insulate the SEC from ongoing constitutional scrutiny in

the exercise of its new extra-constitutional authority, a result that simply cannot be reconciled with the most basic structure of our constitutional system.

## CONCLUSION AND PRAYER FOR RELIEF

Under our Madisonian system, the executive is barred from usurping the legislative branch's Article I powers, no matter how expedient or convenient it is to do so. Unilateral, unchecked executive action is precisely the danger that the Framers most sought to avoid in our constitutional system. Exploiting serial legislative enhancements to its jurisdiction—culminating with Dodd-Frank in 2010—the SEC has now arrogated the power to subject ordinary citizens and businesses to ruinous penalties in a classic Hobson's choice: settle or face trials before its internal judges in a summary procedure that now always ends in defeat. The constitutional and jurisdictional issues presented in this case are consequential and ripe for decision.

For the reasons stated herein, Jarkesy respectfully prays that this Court rule the underlying SEC administrative proceeding void and enjoin any further administrative enforcement proceedings against Jarkesy relating to the subject matter of the Order Instituting Proceedings, because:

(1)     the Commission did not have the constitutional authority to issue the Order Instituting Proceedings against him; and

61

(2)     the full Commission's prejudgment of Jarkesy's culpability two months in advance of his administrative evidentiary hearing, and well in advance of the final hearing and verdict by the Commission, stripped from the proceedings "the very appearance of fairness" demanded by the due process clause of the Fifth Amendment.[35]

Finally, in an extraordinary action the Commission has deliberately expedited its review in Jarkesy's case,[36] perhaps the only such expedited review ordered by the Commission in several decades.   The Commission's unorthodox action fast-tracking the conclusion of the administrative proceeding, in the wake of this Court's ordering an accelerated briefing and submission schedule, threatens to obstruct the appellate jurisdiction of this Court to resolve these claims and may require the exercise of this Court's powers under the All Writs Act, 28 U.S.C. § 1651, to protect its jurisdiction. *See, Envtl. Def. Fund, Inc., v. EPA*, 485 F.2d 780, 784 n.2 (D.C. Cir. 1973) (per curiam) (circuit court has inherent and statutory power to protect its jurisdiction from obstruction).

If the Commission's sudden expedited review of this administrative proceeding threatens an agency Final Decision before this Court can resolve the

---

[35] In the event that the Court does not grant this relief, Jarkesy respectfully requests that this Court reverse the district court's ruling that it did not have subject matter jurisdiction to entertain the constitutional claims and remand to the district court with instructions to resolve those claims.

[36]  *See* Order Granting Review and Scheduling Briefs, p. 2, December 11, 2014, at http://www.sec.gov/litigation/opinions/2014/33-9688.pdf, and *supra* p. 15 n.12.

instant appeal, Jarkesy will seek temporary relief by this Court to protect these appellate proceedings.

Respectfully submitted,

/s/ S. Michael McColloch

S. Michael McColloch
S. Michael McColloch, PLLC
1717 McKinney Avenue, Suite 700
Dallas, Texas  75202
(214) 593-6415 (phone)
(214) 593-6410 (fax)
smm@mccolloch-law.com (email)

Karen Cook
Karen Cook, PLLC
1717 McKinney Avenue, Suite 700
Dallas, Texas  75202
(214) 593-6429 (phone)
(214) 593-6410 (fax)
karen@karencooklaw.com (email)

Mark B. Bierbower
Hunton & Williams, LLP
2200 Pennsylvania Avenue NW
Washington, DC  20037
(202) 955-1665 (phone)
(202) 778-2201 (fax)
mbierbower@hunton.com (email)

*Counsel for Appellants*

Dated:  December 24, 2014        *George R. Jarkesy, Jr., and Patriot28, LLC*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the text of the foregoing Appellant's Brief contains no more than 13,502 words, as reported by the word processing system on which it was prepared, including footnotes and citations, and excluding the corporate disclosure statement, table of contents, table of citations, glossary, the addendum, and the other certificates of counsel, in compliance with FED. R. APP. PROC. 32(a) and D.C. CIRCUIT RULE 32(a)(1).

Respectfully submitted,

/s/ S. Michael McColloch

S. Michael McColloch
S. MICHAEL MCCOLLOCH, PLLC
1717 McKinney Avenue, Suite 700
Dallas, Texas  75202
(214) 593-6415 (phone)
(214) 593-6410 (fax)
smm@mccolloch-law.com (email)

*Counsel for Appellants*
*George R. Jarkesy, Jr., and Patriot28, LLC*

December 24, 2014

64

# CERTIFICATE OF SERVICE

I hereby certify that, on this 24th day of December, 2014, I caused the original of the foregoing document to be electronically filed with the clerk of this Court by using the CM/ECF system. I certify that the participant in the case are registered CM/ECF users and the service will be accomplished by the appellate CM/ECF system. Pursuant to D.C. CIRCUIT RULE 31(b), I have also caused eight copies of the foregoing document to be filed, by hand delivery, with the clerk of this Court.

Respectfully submitted,

/s/ S. Michael McColloch

S. Michael McColloch
S. MICHAEL MCCOLLOCH, PLLC
1717 McKinney Avenue, Suite 700
Dallas, Texas  75202
(214) 593-6415 (phone)
(214) 593-6410 (fax)
smm@mccolloch-law.com (email)

*Counsel for Appellants*
*George R. Jarkesy, Jr., and Patriot28, LLC*

December 24, 2014